IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2017 Session

## STATE OF TENNESSEE v. DEVIN BUCKINGHAM

**Appeal from the Criminal Court for Shelby County**
No. 14-03628      W. Mark Ward, Judge

_____

### No. W2016-02350-CCA-R3-CD

_____

A Shelby County Criminal Court Jury convicted the Appellant, Devin Buckingham, of first degree premeditated murder, and the trial court sentenced him to life. On appeal, the Appellant contends that the evidence is insufficient to support the conviction; that the trial court erred by ruling that defense counsel's notes, taken during counsel's interview of a defense witness, qualified as <u>Jencks</u> material; and that the trial court erred by prohibiting defense counsel from questioning a defense witness about the victim's prior bad acts. Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Joseph A. McClusky (on appeal) and Greg Carman and Phil Harvey (at trial), Memphis, Tennessee, for the appellant, Devin Buckingham.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Greg Gilbert and Jose Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In July 2014, the Shelby County Grand Jury indicted the Appellant for the first degree premeditated murder of Alex Winfield and the aggravated assault of Michael Wheeler. The Appellant's four-day trial began on July 25, 2016.

At trial, Officer Joshua Stanley of the Memphis Police Department (MPD) testified that "right after lunch" but before 1:00 p.m. on January 9, 2014, he was

dispatched to The Meadows apartment complex. When he arrived at 2220 Meadow Glade Lane, he saw Alex Winfield lying on the ground and a crowd of people. The victim had a "massive" gunshot wound to the head, and coagulated blood, brain matter, and bone fragments were on the ground. A plastic bag was beside the victim. Officer Stanley called for emergency medical services and "set up a perimeter." People in the crowd said they saw the shooter get into the passenger side of a late-model, gray Mustang, so Officer Stanley broadcast information about the car over the police radio. The shooter was described as "a smaller frame black male armed with a handgun."

Officer Stanley testified that he did not notice any rain when he arrived at The Meadows but that it began raining "pretty hard" while he was on the scene. He spoke with Michael Wheeler, who had been with the victim just prior to the shooting. Officer Stanley said that he "wouldn't characterize [Mr. Wheeler] as being cooperative with us on the scene" and that Mr. Wheeler "didn't act the way I would have acted if I was with someone and they were murdered." On cross-examination, Officer Stanley testified that he did not think the police located the Mustang.

Carl Winfield, Sr., the victim's father, testified that he last saw the victim alive on January 8, 2014, when the victim worked for him at his clothing store in downtown Memphis. The next day, he learned from his older son, Carl Winfield, Jr., that the victim had been killed. The victim was twenty-one years old.

Jean Winfield Threat, the victim's mother, testified that she last saw the victim alive on January 8, 2014, when she picked him up from his apartment in The Meadows where he lived with his older brother, Carl Jr.[1] Ms. Threat drove the victim to her parents' home so her parents could take him to work at his father's store the next day. On January 9, Carl Jr. telephoned Ms. Threat and told her the victim had been shot and was lying in the parking lot. Ms. Threat said that she received the call about "twelvish. . . . Probably 12:30" and that she drove to The Meadows. The victim was in an ambulance, and emergency personnel were "working on" him. At some point, the ambulance's emergency lights were turned off, and Sergeant Mark Berryman asked that Ms. Threat come to his patrol car. He informed her that the victim was deceased.

Ms. Threat testified that Michael Wheeler lived next door to her brother and "was like a family friend." Mr. Wheeler and the victim were friends "off and on" about ten years. Ms. Threat said that she did not see Mr. Wheeler at The Meadows on January 9 but that he had been there and "left from [her] understanding." Ms. Threat stated that she expected Mr. Wheeler to testify at the Appellant's trial but that she had not seen him.

---

[1] Because Carl Winfield, Jr., shares a name with his father, we will refer to him as "Carl Jr." for clarity. We mean no disrespect to the witness.

- 2 -

Carl Winfield, Jr., testified that in January 2014, he and the victim were living at 2220 Meadow Glade Lane in The Meadows and that Michael Wheeler was staying with them. On the morning of January 9, the victim had been to his grandmother's house but returned home about 10:00 a.m. The victim wanted to go to the store, so Carl Jr. gave him some money.

Carl Jr. testified that the victim and Mr. Wheeler left for the store about 11:00 a.m. and that the store was "at the corner of Raleigh Lagrange and Sycamore View." About fifteen to twenty minutes later, Carl Jr. heard three gunshots and went outside. The victim was lying on the ground, and a man "was out there talking to him and telling him he was going to be all right." Carl Jr. did not know the man but later learned his name was "Brian." Carl Jr. said Mr. Wheeler "had ran to the back of the apartments because the guy pointed the gun at him." However, Mr. Wheeler returned to the scene and talked with the police.

On cross-examination, Carl Jr. testified that the day after the shooting, he received a telephone call from the victim's girlfriend. She gave Carl Jr. the name of the person who may have shot the victim. Carl Jr. acknowledged that he "pulled up" a photograph of the person on his computer and that he showed the photograph to Mr. Wheeler. Carl Jr. then contacted Sergeant Berryman.

Brian Ayers testified that on January 9, 2014, he was staying at his niece's apartment at 2210 Meadow Glade Lane in The Meadows. That morning, he walked to the store. On his way back to his niece's apartment, he passed the victim and Michael Wheeler, who were walking to the store. Mr. Ayers did not know the two men at that time.

Mr. Ayers testified that about "twelve, 12:10," he looked out the blinds of the apartment and saw the victim and Mr. Wheeler returning from the store. The two men were walking on the sidewalk, and the victim was carrying a bag. Mr. Ayers saw a third man walking around an "Herbal Life van" in the parking lot, and a gray Mustang was parked next to the van. Mr. Ayers went outside to smoke and heard "something go pow." He thought the sound was a car's backfire but went inside the apartment just to be safe. He went back outside and saw the victim fall to the curb. A fourth man, who was wearing a gray hoodie and holding a pistol, came out from behind the bushes, and the man and the victim "had words." Mr. Ayers called 911.

Mr. Ayers testified that while he was on the telephone with 911, the man with the gun said something to the victim and pointed the gun at the victim. The man shot the victim twice in the temple and ran toward the Mustang. When the shooter got to the car,

"the hoodie flew off his head," and he and Mr. Ayers made "eye to eye contact." The shooter got into the Mustang, and the Mustang drove away. Mr. Ayers gave a description of the Mustang to 911.

Mr. Ayers testified that he went to the victim and told the victim that the victim was going to be okay. The victim was trying to talk, and Mr. Ayers noticed two holes in the victim's head. The victim "reached his hand up," and Mr. Ayers saw that his hand was "halfway shot off." Mr. Ayers grabbed the victim's other hand and started praying for him. He described the gun used to shoot the victim as "a long pistol. . . . Like a John Wayne gun."

Mr. Ayers testified that he did not see Mr. Wheeler at the time of the shooting. However, police on the scene later talked with Mr. Ayers and Mr. Wheeler in separate police cars. Mr. Ayers also gave a formal statement at the police department. Two days after the shooting, he viewed a six-photograph array. He selected the Appellant's photograph and wrote on the photo, "I saw him [shoot] the guy standing right up on him and he fired."

Mr. Ayers identified the Appellant at trial as the shooter but said the Appellant had gained weight since the shooting and had a different hairstyle. The Appellant also was wearing glasses at trial but not on the day of the shooting. Regarding Mr. Ayers's ability to see the Appellant when he and the Appellant made eye contact after the shooting, Mr. Ayers said, "[There] wasn't anything in my way. It was just as clear as I'm sitting here looking at everybody in this room. It was just that clear."

The State played Mr. Ayers's 911 call for the jury. During the call, Mr. Ayers described the shooter as "a short guy, standing about five two, five three"; with a "light mustache"; and wearing a gray hoodie. He described the driver of the Mustang as "a tall dark-skinned guy." Mr. Ayers told the 911 dispatcher that he heard the victim say before the shooting, "'Naw, man, naw, don't shoot me, man.'" Mr. Ayers also told the dispatcher that the victim was still breathing but gasping for air.

On cross-examination, Mr. Ayers testified that he was talking on the telephone when he first saw the victim and Mr. Wheeler walking on the sidewalk. He said that when the Appellant came out of the bushes, the Appellant was holding the gun with both hands. The Appellant walked up to the victim, who was lying on the ground and begging for his life. The victim had his hand over his head as if he could stop a bullet from hitting him, and the Appellant shot the victim twice. Mr. Ayers acknowledged that the shooting did not occur directly in front of his niece's apartment and said that it occurred "further down" from the apartment. After the shooting, the Appellant ran to the Mustang. The

Mustang had a black convertible top, was backed into a parking space, and "just pull[ed] on out."

Mr. Ayers acknowledged that the shooting was shocking and stressful, that it occurred within a matter of seconds, and that he was upset during his call to 911. He said he called 911 between 12:10 and 12:15 p.m. He acknowledged, though, that he could have been mistaken about the time because his 911 call was recorded at 12:43 p.m. He stated, "I just know it was around twelve." Mr. Ayers did not know the victim or the victim's family prior to the shooting but met the victim's family members after the shooting and stayed in contact with them. He said that after he grabbed the victim's hand, he told the victim, "I know how [the shooter] looked and I promise you if I got anything to do with it he will not get away with it."

Mr. Ayers acknowledged that in his statement to the police, he said the man standing beside the Herbal Life van was talking on the telephone. However, he said at trial that he did not remember making that statement. He also acknowledged saying in his statement that he saw Mr. Wheeler run away after the shooting and heard Mr. Wheeler say, "[H]e's shooting. He's shooting." Mr. Ayers said that his statement was "twisted" and that he "didn't say that." Mr. Ayers said in his statement that he heard four gunshots and that the victim was probably five feet, four inches tall. He acknowledged initialing every page of his statement, signing his statement, and reviewing it before he signed it.

On redirect examination, Mr. Ayers testified that although the incident occurred two years before trial, his attention was focused on the shooter and the shooter's face would never leave his mind. He stated that the shooter got a good look at him and that he had nightmares for more than two weeks after the shooting because he was afraid the shooter would come for him. He stated that after he heard the first gunshot, he saw the man by the Herbal Life van get into the Mustang.

Thomas Morris testified that on January 9, 2014, he was living in The Meadows. Sometime late that morning, Mr. Morris heard someone running through the breezeway by his apartment and "some kind of verbal exchange" between two people right outside his apartment. Mr. Morris then heard gunshots. He lifted the window blinds in time to see the victim "drop to the pavement dead." Mr. Morris also saw an African-American male "run down the sidewalk in between two cars." The male got into a "waiting" Mustang, and the Mustang left the parking lot at a high rate of speed. Mr. Morris said he did not get a good look at the shooter's face but that the shooter was wearing a "puffy" jacket. The jacket's hood was over the shooter's head, but the hood came off as the shooter ran. Mr. Morris estimated that the shooter was five feet, ten inches tall.

- 5 -

Mr. Morris testified that he went outside to the victim and that the victim appeared to have a wound to his chest and a wound to the side of his forehead. The back of the victim's head was gone. Mr. Morris stated that the victim was dead but that people kept "running up to him trying to shake him and see if he was okay." Mr. Morris did not see any shell casings on the ground, which made him think the gun was a revolver.

Charlotte Brown testified that on January 9, 2014, she was living in The Meadows. About 12:25 p.m., Brown saw a man "running across the parking lot in his boxers and nothing else." About twenty minutes later, she heard two people arguing. She stated, "I heard someone say that they heard that it was his brother's crowbar used or something to that effect. It was your brother's crowbar. And I heard the victim say that I didn't do it. I didn't do it." Ms. Brown looked out her bedroom window and saw the victim and the front of a car. The car was silver and appeared to be a sports car. She said the car "was in front of mine. Like he just pulled up[.]" The victim was standing, and the second person was in the silver car. Ms. Brown stated, "They were going back and forth about it wasn't me. I didn't do it. And then I heard someone say I beat, I don't remember the name that they called out, but they said I beat someone's ass until they told me you did it." The State asked if she thought the speaker was referring to beating the man in the boxer shorts, and she answered, "I believe so." She continued as follows: "I heard the victim say I didn't do it. I wasn't there. I thought we were better than that. And then I heard him say I can pay for it. I can pay for it, but I didn't do it."

Ms. Brown testified that she heard the victim say that "you don't have to shoot me over this" and that she moved to the side of the window. She heard another voice say, "[G]o ahead and pop that n***a." The victim again stated that "you don't have to shoot me over this." Ms. Brown crouched down. She heard a gunshot and tires screeching. She looked out the window and saw the victim slumped over the trunk of her car. He pulled himself up like he was going to run, and Ms. Brown heard someone say that "he's not gone. He's not gone. Get him. Get him. He's not gone." Ms. Brown moved away from the window. She heard tires screech again and one or two more gunshots followed by laughter. She then heard someone say that "he's definitely gone now," a car door slam, and tires screech. She never saw the shooter.

Ms. Brown testified that she called 911. She looked out the window, saw the victim lying next to her car, and went outside. The victim was twitching and unable to speak. Ms. Brown could not see his face because he was lying face-down. When she did see his face, "half of [it] looked like it was gone."

On cross-examination, Ms. Brown testified that she never saw anyone with the victim and that she heard a total of three voices. One of the voices was that of the victim, and a second voice sounded like it was coming from the silver car. She acknowledged

that the victim continued to protest that he "didn't do whatever it was." The shooter then shot the victim.

Ms. Brown testified that when she saw the man in the boxer shorts before the shooting, he was calling for help. He ran across the parking lot toward Ms. Brown's apartment building, past Ms. Brown's door, and through the breezeway of the building. Carl Jr.'s apartment door also was in the breezeway. After the shooting, Ms. Brown saw the man near the victim. He was wearing a bathrobe, was talking to the police, and appeared to have been injured. He had a large cut across his nose, he had a "busted" lip, and "[h]is jaw appeared to be swelling up." She acknowledged that she heard him say "contradictory things" to the police. On redirect examination, Ms. Brown testified that she later came to know Michael Wheeler and that he was the man wearing the boxer shorts and bathrobe.

Katirria Coburn testified that she was the victim's girlfriend in January 2014 and that they dated two and one-half years. Ms. Coburn did not know the Appellant personally at the time of the shooting, but the Appellant's mother and Ms. Coburn's mother lived across the street from each other. Their mothers used to be friends, and Ms. Coburn would see the Appellant "out in the yard." Ms. Coburn said that she was five feet, four inches tall and that the Appellant was "definitely" shorter than she. The State asked if she knew whether the Appellant was in the courtroom, and she answered no.

Ms. Coburn testified that about two weeks before the victim was killed, the victim told her that he went into the Appellant's residence and "took some objects." The victim showed the Appellant's social security card to Ms. Coburn and tried to sell her sister a television. The victim indicated to Ms. Coburn that he thought he was in danger of being harmed by the Appellant.

Ms. Coburn testified that on the morning of January 9, she telephoned the victim about eight times, but the victim did not answer. She went to The Meadows and knocked on Carl Jr.'s door. The victim's cousin, Steve, answered the door and told Ms. Coburn the victim had been shot. Ms. Coburn said the Appellant came to mind as "the only person . . . that could have done it." She told Steve about the Appellant, but she never spoke to the police or gave them the Appellant's social security card. Ms. Coburn learned a Mustang was involved in the shooting. She stated, "It . . . triggered something because [there] used to be a Mustang parked across the street in [the Appellant's] mom's driveway. And it was a guy that was tall with dreads that used to be over there that drove the Mustang." She said that the Mustang was black or gray and that she thought it had a black convertible top.

On cross-examination, Ms. Coburn acknowledged that she never heard the Appellant threaten the victim. She also acknowledged that she saw the victim with items he took during a burglary but that she never told prosecutors or defense counsel's investigator about seeing stolen property. The victim told Ms. Coburn that he obtained the items from the Appellant's residence. Ms. Coburn said she had never seen the victim with stolen property previously.

Ms. Coburn denied being at the Ridge Crest apartment complex before the Appellant's trial and telling a group of girls there that her mother made her lie to the prosecutors about the Appellant. She also denied telling the girls that she was "going to come clean since [her] mom had put her out of her house." On redirect examination, Ms. Coburn testified that she had never been to Ridge Crest. She said she had her own place to live and denied that her mother "ever put [her] out."

Detective Fausto Frias of the MPD testified that Sergeant Berryman developed the Appellant as a suspect. Detective Frias created a six-photograph array containing the Appellant's photograph and showed the array to Brian Ayers. Detective Frias said that as soon as Mr. Ayers looked at the array, Mr. Ayers "went to [the Appellant's] picture and said that's the one." After the positive identification, Detective Frias arrested the Appellant. The State asked that Detective Frias "point out" the Appellant in the courtroom, and Detective Frias said, "He's wearing glasses. A lot different than when I took him into custody. He didn't have on glasses and his hair was much different than how he has it now." Detective Frias said the Appellant also had "gained a little weight" since his arrest.

On cross-examination, Detective Frias denied that Mr. Ayers asked if he had selected the right person from the array. Detective Frias acknowledged that the police also developed Devin Carroll as a suspect and that he never showed a photograph array containing Mr. Carroll's photograph to Mr. Ayers.

Sergeant Mark Berryman of the MPD testified that he investigated the shooting and went to The Meadows on January 9, 2014. The victim was lying in the parking lot. The police did not find a gun at the scene and did not locate any shell casings on the ground, meaning that the shooter likely used a revolver. Michael Wheeler was present, and Sergeant Berryman considered him a "potential" victim. Mr. Wheeler went to the police department and gave a statement.

Sergeant Berryman testified that initially, he did not have any suspects. However, Carl Jr. learned from the victim's girlfriend that the Appellant could have been involved. Detective Frias created a photograph array containing the Appellant's photograph and showed the array to Brian Ayers. Mr. Ayers positively identified the Appellant.

- 8 -

Sergeant Berryman learned the Appellant lived in the Deerfield apartment complex, which was two complexes behind The Meadows. He acknowledged that in order to walk from the victim's apartment to the store at the corner of Raleigh Lagrange and Sycamore View, the victim had to pass by or through Deerfield.

Sergeant Berryman testified that Detective Frias arrested the Appellant and brought him to the police department. Sergeant Berryman advised the Appellant of his rights, and the Appellant agreed to speak with the officer. The Appellant told Sergeant Berryman that he thought the victim broke into his home but that he was not present when the victim was shot. The Appellant claimed he was "walking around with his girlfriend that day" and denied having any connection to a Mustang. When Sergeant Berryman began asking the Appellant specific questions, the Appellant became belligerent and ended the interview. Sergeant Berryman never located the Mustang involved in the shooting.

On cross-examination, Sergeant Berryman acknowledged that witnesses claimed to have heard screeching tires on January 9 but that he did not find any tire marks in The Meadows parking lot. He also acknowledged that the Appellant agreed to speak with him without a lawyer present and that the Appellant was under no obligation to do so. The Appellant told Sergeant Berryman that he and the victim used to be friends but that he stopped having contact with the victim after someone broke into his apartment. The Appellant told the officer that he did not kill the victim and that he was with his girlfriend on the day of the shooting. Sergeant Berryman acknowledged that he kept accusing the Appellant of being the shooter and that the Appellant said he was "done talking." Sergeant Berryman never spoke with the Appellant's girlfriend and never investigated the Appellant's alibi claim. He acknowledged that Devin Carroll also was a suspect and that he never showed Mr. Carroll's photograph to Mr. Ayers.

On redirect examination, Sergeant Berryman testified that Mr. Carroll was present at the Appellant's apartment when the police arrested the Appellant. Sergeant Berryman said that Mr. Carroll and the Appellant looked different from one another and that Mr. Carroll was about six feet tall. Sergeant Berryman showed a photograph array containing Mr. Carroll's photograph to Mr. Wheeler, and Mr. Carroll agreed to speak with Sergeant Berryman. Sergeant Berryman ultimately decided not to charge Mr. Carroll with a crime because he determined that Mr. Carroll was not involved in the shooting.

Officer Stacy Milligan of the MPD testified that she went to The Meadows on January 9, 2014, to investigate the crime scene and take photographs. It had been raining "pretty heavy" that day, and the rain had washed away some of the victim's blood. A towel and a bag of potato chips were in the parking lot. Officer Milligan tried to obtain

fingerprints from the scene but did not find any prints of value. She also did not find any tire marks or footprints.

Marco Ross, the Chief Medical Examiner for Shelby County, testified as an expert in forensic pathology that he conducted the victim's autopsy. The victim received three gunshot wounds that could have been caused by two to four bullets. The victim had one entrance wound on the right side of his forehead, and the bullet exited his left cheek. Dr. Ross did not see any powder burns around the wound, meaning the gun was probably more than three feet from the victim when it was fired. The front part of the victim's brain was "pulpified," and he probably would have been immobile and unable to speak after he received the injury. Dr. Ross said the odds of surviving the injury were very low. Another bullet entered the victim's pelvis, perforated his bladder and pelvic bone, and exited his left buttock. The victim was clothed, so Dr. Ross did not find any powder burns around the entrance wound. The pelvic wound was more survivable than the head wound.

Dr. Ross testified that the victim had a third gunshot wound to the thumb and index fingers of the victim's right hand, and he described the wound as "tangential," meaning it was a "deep grazed wound." Dr. Ross acknowledged that the victim could have received the wound if he was holding his hand over his head when he was shot in the head. Dr. Ross could not determine the order of the gunshots from the victim's autopsy. However, based on information from witnesses, he opined that the victim was shot first in the pelvis and then the head. He also opined that the gun was a thirty-eight caliber, forty caliber, or nine millimeter and said that the gun had to be above and to the right of the victim's head when it was fired. Toxicology tests showed marijuana in the victim's system. Dr. Ross concluded that the victim's cause of death was gunshot wounds to the head and pelvis.

Edward Hall testified that he worked for the district attorney general's office, assisting prosecutors "in locating witnesses, anything they need help to present a case." Mr. Hall tried to find Michael Wheeler in order to serve Mr. Wheeler with a subpoena. Specifically, Mr. Hall used computer "search engines" and tried to find relatives and a current address or telephone number for Mr. Wheeler. A material witness warrant also was issued for Mr. Wheeler, but Mr. Hall was unable to find him. At the conclusion of Mr. Hall's testimony, the State rested its case-in-chief, and the trial court granted the Appellant's motion for judgment of acquittal with regard to the aggravated assault of Mr. Wheeler.

Lenwood Jones testified that he knew Katirria Coburn, the Appellant, and the victim and that he came into contact with Ms. Coburn at the Ridge Crest apartment complex "last week on Saturday." Mr. Jones stated that he was standing in the

breezeway on the second floor, waiting for his "ride," and that Ms. Coburn was on the first floor with a group of girls. Mr. Jones heard Ms. Coburn mention the names of the victim, the Appellant, and the Appellant's mother. He then heard Ms. Coburn say that "she lied and wished that all of this was behind her" and that "she was lying because she was staying with her mother at the time and her mother did not like [the Appellant's mother]." Mr. Jones said Ms. Coburn also stated that she "shouldn't [have] just lied with her mother because she's not with her mother no more. She got put out."

On cross-examination, Mr. Jones testified that he met Ms. Coburn only one time in November or December 2013 but that he was able to recognize her face and voice two weeks before trial "cause I'm good with faces." Mr. Jones acknowledged that when he heard Ms. Coburn talking, she and the girls were in the breezeway beneath him. He saw them because he had to walk past them to go upstairs.

Jasmine Taper testified that she was the Appellant's girlfriend at the time of the shooting. About 12:15 p.m. on January 9, 2014, Ms. Taper telephoned the Appellant from Anthem Career College and told him to take her to get something to eat. Three to five minutes later, the Appellant texted Ms. Taper that he was "about to pull up." Another two to three minutes later, the Appellant texted Ms. Taper that he was outside. Ms. Taper walked outside and saw the Appellant, who did not have a car, in the passenger seat of a black Jeep Cherokee. A man named "Wiz" was driving the Jeep. Wiz drove the Appellant and Ms. Taper to the McDonalds on Sycamore View, the Appellant and Ms. Taper went inside, and Ms. Taper ordered food. When she received her order three to five minutes later, her order was incorrect. The restaurant remade the order, which took another five minutes. Ms. Taper received her food, she and the Appellant returned to the Jeep, and Wiz drove them back to Anthem Career College. Ms. Taper and the Appellant went inside the college, they talked for five to eight minutes, and the Appellant left. Ms. Taper said that the Appellant was with her for a total of about thirty minutes and that she remembered that day because it was the last day she saw the Appellant before he went to jail.

On cross-examination, Ms. Taper denied being in love with the Appellant. She said that she had visited the Appellant less than five times in jail and that they missed each other but "that's about it."

Ms. Taper testified that she spoke with defense counsel before trial but that she did not remember telling counsel she received a text from the Appellant at 12:35 p.m. on January 9. She maintained that she telephoned the Appellant at 12:15 p.m., that he picked her up at 12:20 p.m., that they ordered food at McDonalds, and that they returned to the college about 12:45 p.m. Ms. Taper acknowledged that she did not tell the police or the State's investigator that she was with the Appellant on January 9. On redirect

examination, Ms. Taper testified that Sergeant Berryman never contacted her and that defense counsel told her to testify truthfully.

Demorris Delbridge testified that his nickname was "Wiz." On January 9, 2014, Mr. Delbridge received a telephone call from the Appellant, asking if Mr. Delbridge could drive Jasmine Taper to McDonalds. Mr. Delbridge, who was driving a black Jeep Grand Cherokee, picked up the Appellant at the Appellant's apartment and drove the Appellant to Ms. Taper's school. The Appellant went inside, Ms. Taper came outside with the Appellant, and Mr. Delbridge drove them "across the street to the McDonalds." The Appellant and Ms. Taper went inside the restaurant while Mr. Delbridge waited in the Jeep, and the Appellant and Ms. Taper were inside about fifteen minutes. Mr. Delbridge then drove the Appellant and Ms. Taper back to the school. The Appellant walked Ms. Taper inside, and he was inside with her "[a] good ten minutes." The Appellant returned to the Jeep, and Mr. Delbridge drove the Appellant home. He said the entire trip took thirty to forty minutes.

On cross-examination, Mr. Delbridge testified that on January 9, 2014, he lived in the apartment complex next to the Appellant's complex. He estimated that driving Ms. Taper and the Appellant from the school to McDonalds took about two minutes, and he did not know why Ms. Taper did not walk to McDonalds. He said that it was not raining and acknowledged that the day was sunny. After Mr. Delbridge dropped off the Appellant at the Appellant's apartment, Mr. Delbridge returned to his own apartment. He got home about 12:30 or 12:40 p.m.

Mr. Delbridge testified that at some point, he learned the district attorney's office was trying to contact him. He telephoned the office but did not talk to an investigator. He acknowledged that he did not want to speak with an investigator but said that he was not trying to hide anything and was telling the truth. He stated that he still drove the Jeep but that it had never been registered to him. Therefore, he could not prove he owned the Jeep in 2014.

Cathy Byrd, an investigator for the public defender's office, testified that she went to the crime scene and used crime scene photographs to locate where the victim was shot. She measured the distance from the doorway of Brian Ayers's apartment to the point on the sidewalk where the victim collapsed, and the distance was 81.1 feet. Next, Ms. Byrd stood at the doorway of Mr. Ayers's apartment to determine if she could see where the shooter stepped out of the bushes. Ms. Byrd said that in order to get a clear view of that area, she had to travel 129 feet. On cross-examination, Ms. Byrd acknowledged that she did not know where Mr. Ayers was standing when he witnessed the shooting.

Dr. Jeffrey Neuschatz testified as an expert in witness identification that he was a cognitive psychologist, focusing his research on eyewitness memory and the effect of certain factors on identifications. He said that in his opinion, there were four requirements for a fair and accurate lineup. First, the witness viewing the lineup should be told that the suspect may or may not be in the lineup. Second, the person conducting the lineup should not know the identity of the suspect and should tell the witness that he or she does not know the identity of the suspect. Third, the lineup should include five to twelve "fillers," people known to be innocent, and the suspect should not "unduly stick out" from the fillers. Finally, if the witness viewing the lineup identified someone, the person conducting the lineup should take a "confidence statement" from the witness, asking how confident the witness was on a scale of one to ten that the witness picked out the right person. When Detective Frias showed Brian Ayers the lineup in this case, the first and third requirements were met, but the second and fourth requirements were not met.

Dr. Neuschatz testified that a witness would have difficulty remembering an event accurately when the exposure time to the event was of very short duration, the witness could not study or rehearse the event, the witness was under stress at the time of the event, or the witness's view of the event was obstructed. Dr. Neusatchz acknowledged that those factors existed in this case, making it more difficult for Brian Ayers to encode the event in his memory accurately. He stated that a witness could see more details of an event if the witness was in close proximity to the event and that a witness's accuracy in identifying a suspect "suffered" beyond forty-five feet. Defense counsel noted that Mr. Ayers was more than eighty feet from the shooting. Dr. Neuschatz stated that a suspect's head or face being covered also affected the accuracy of a witness's identification, and he acknowledged that even a partial covering could affect facial recognition. Moreover, every time a witness thought about the memory, the memory could change. Finally, the witness's version of the event would be more accurate if given close in time to the event.

On cross-examination, Dr. Neuschatz said he had testified for defendants in about one hundred trials. He acknowledged that he usually testified for defendants to question the identification of witnesses and that the defense was paying him in this case. He said that Detective Frias used an appropriate number of fillers in the Appellant's lineup and that the filler photographs did not "stick out" from the Appellant's photograph. Moreover, Detective Frias advised Mr. Ayers that the suspect may or may not be in the lineup. Dr. Neuschatz acknowledged that he never visited the crime scene or talked with Mr. Ayers. He also acknowledged that in some cases, witnesses made accurate identifications even though they were under stress or had short exposure times to events. He said he had "no idea" whether Mr. Ayers's identification of the Appellant was accurate or inaccurate.

- 13 -

Alisa Styles testified on rebuttal for the State that she was employed in the Shelby County Sheriff's Office Jail Division and responsible for inmate records. At the State's request, Ms. Styles obtained the visitation records for the Appellant. Specifically, the State asked for information regarding the Appellant's being visited by Demorris Delbridge and Jasmine Taper. According to the records, Mr. Delbridge visited the Appellant twice: one time on April 14, 2016, and again on June 2, 2016. Ms. Taper visited the Appellant thirteen times between February 4, 2014, and March 11, 2015.

Katirria Coburn was recalled by the State and testified that she did not know Lenwood Jones. She stated that she saw Mr. Jones in the courtroom the previous day but that she had never seen him prior to that day. Ms. Coburn said that Mr. Jones was not telling the truth about hearing her say she lied about the Appellant. She said she had lived in her own townhome since 2013, and she identified her 2013 lease and her most recent lease for the State.

Edward Hall, the State's investigator, was recalled by the State and acknowledged that after the State received notice of the Appellant's alibi, he attempted to contact Demorris Delbridge. Mr. Hall spoke with Mr. Delbridge's mother on the telephone, and she said she would have Mr. Delbridge call Mr. Hall. However, Mr. Hall never heard from Mr. Delbridge. Mr. Hall also tried to talk with Jasmine Taper, but Ms. Taper told him that she had already given a statement to the public defender's office and that she did not want to give another statement. In preparation for trial, Mr. Hall went to the McDonalds near Anthem Career College and tried to obtain the January 2014 video from the restaurant. No video was available. He stated that the Deerfield apartment complex was 1.3 miles from Anthem and that the driving time from the college to the apartment complex was about five minutes. On cross-examination, Mr. Hall acknowledged that the driving time depended on traffic lights and the driver's speed.

At the conclusion of the proof, the jury convicted the Appellant as charged of the first degree premediated murder of the victim. The trial court immediately sentenced him to life.

## II.  Analysis

### A.  Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the conviction because his motive to shoot the victim was "at best tenuous," his identification as the shooter was "questionable," and the police ignored other possible suspects. The State argues that the evidence is sufficient. We agree with the State.

- 14 -

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Taken in the light most favorable to the State, the evidence shows that on January 9, 2014, a man shot the victim in the pelvis, head, and thumb. Katirria Coburn, the victim's girlfriend, testified that when she learned about the shooting, she immediately thought of the Appellant because the victim had broken into the Appellant's home and because the victim feared the Appellant was going to harm him. Just prior to the shooting, Charlotte Brown heard the shooter tell the victim that "I beat someone's ass until they told me you did it" and heard the victim offer to "pay for it" but maintain that he "didn't do it." Brian Ayers, who witnessed the shooting, saw the shooter's face when the hood blew off his head and identified him as the Appellant in a photograph array two days after the shooting and again at trial. Sergeant Berryman questioned the Appellant, and the Appellant told the officer that he thought the victim burglarized his home. Sergeant Berryman acknowledged that he developed another suspect in the case but ultimately ruled out that suspect as being involved. In short, the State produced strong

- 15 -

evidence of the Appellant's having a motive to harm the victim and his being the person who shot the victim. Thus, the evidence is sufficient to support the Appellant's conviction.

### B. Jencks Material

Next, the Appellant claims that that the trial court erred by ruling that defense counsel's notes, taken during counsel's interview of Jasmine Taper, qualified as Jencks material and, therefore, had to be turned over to the State. The State argues that the trial court did not err. We conclude that the trial court erred but that the error was harmless.

On cross-examination, the State asked Ms. Taper if she talked with the public defender's office, and she said yes. The State then asked, "Did you give them a statement?" Ms. Taper answered, "Yes, I did." At that point, the State requested "any Jencks material if there is." Defense counsel responded, "Judge, there is no Jencks material. There's work product of me talking to this witness. There's no recording of her statement." The State advised the trial court, "If there's any notes we would request those, Judge." Defense counsel argued that his notes did not qualify as Jencks material because they were not Ms. Taper's "statement." The trial court sent the jury out of the courtroom and examined the notes. The notes, which were handwritten in all capital letters, stated as follows:

W CALLED [DEFENDANT]
12:35 TEXTED W "ABOUT TO PULL UP"
ABOUT 3 MINUTES LATER [DEFENDANT] TEXT I'M HERE
W COMES OUT ABOUT 2 MINUTES LATER
JEEP CHEROKEE
IN PARKIING LOT
JUMPED IN CAR
MADE LF S VIEW
TURN RT PARKING LOT
WIZ IN CAR
[DEFENDANT] & W WENT IN ORDERED FOOD
3 MINT. FOOD COMES OUT & IS COLD
McD RE-DOES FOOD
5 MIN FOOD IS READY
TALKING ABOUT, [indecipherable]
GOT IN WIZS CAR
LF THE SAME WAY
WENT BACK COLL.
D WALKED W IN SCHOOL

TALKED 5-8 MINUTES
SAW [DEFENDANT] GET IN WIZ CAR

The court ruled that the notes qualified as <u>Jencks</u> material and gave the State "a few moments" to read the notes. When the State's cross-examination of Ms. Taper resumed, the following colloquy occurred:

Q.    Do you remember telling [defense counsel] that you got [the Appellant's] text at 12:35?

A.    No, I don't remember telling him --

Q.    You don't remember that?

A.    No.

Q.    Would it surprise you if he had written over here on it says 12:35 in his handwriting?

A.    No, he might have --

Q.    You think [defense counsel] is mistaken?

A.    Yeah, he might have got it mistaken cause that's not what I said.

Q.    Oh, he just wrote that number wrong?

A.    I guess so.

Q.    Because you said 12:15?

A.    Yes, I did.

Q.    So at 12:15 you're at the college; right?

A.    Yes, I was.

Q.    You get hungry?

A.    Yes.

. . . .

Q.      So at 12:15 you texted Devin I'm hungry?

A.      No, 12:15 I called Devin.

Q.      And you called Devin and he comes and he gets you five minutes later.

A.      I don't know how many minutes later.

Q.      That's what you said 10 minutes ago.

A.      No, I did not.

Q.      Do you have your phone record?

A.      I have a whole new phone.

Q.      So what time did Devin pick you up?

A.      About around -- I'm not going to say about because I don't know the exact time. I'm going to say about 12:20. Somewhere around that time.

Q.      And you [go] to McDonalds and he drops you off and what time is it now?

A.      No, he did not drop me off at McDonalds.

Q.      Oh, no. You go to McDonalds with Whoos -- Wiz?

A.      Yes.

Q.      And you eat?

A.      No.

Q.      And then you come back to [the] college?

A.     No.  No, that's not what happened.  I didn't eat at the McDonalds.  I ate when I got back to the college while we was having a conversation.

Q.     And what time was that?

A.     Around maybe 12:45 somewhere.  I don't know.  Around that time.  12:45, 12:50, somewhere around that time.  I don't know.  I'm not sure.

Q.     So based on this new information or the new time line you've given us, it appears that this whole process took 25 minutes.  Does that sound right?

A.     About 30 minutes the whole process.

Q.     The whole process?

A.     Uh-huh.

Q.     That's not what you told [defense counsel], is it?

A.     That's is what I told him.

Q.     That's not what he's written --

A.     I said about 30 minutes.  I don't know what he [has] written there.

At that point, defense counsel asked for a jury-out conference.  After the jury left the courtroom, counsel objected to the State's "improper characterization" of his notes and argued as follows:

> There's nothing in my notes here that indicate that she said any time less than about 30 minutes for the whole event. . . . [W]hat's written in this, again, is not a verbatim statement of this witness.  That's my whole point.  This isn't exactly everything that she said.  [They] are just notes from that conversation.

- 19 -

The trial court ruled that it was going to "resolve" the issue by allowing the State "to ask her exactly how [defense counsel] has written it. . . . So in other words, not [the State's] interpretation of [the notes] but exactly what it is. . . . You can ask about each item of the time line just as [defense counsel] has written it but that's it." The State advised the court that it would "move on" and not question Ms. Taper further from the notes.

At the motion for new trial hearing, the trial court stated that it "regretted" giving defense counsel's notes to the State and that it was "95 percent convinced" the notes were not a "statement" under Tennessee Rule of Criminal Procedure 26.2. The trial court noted, though, that the State did not mention anything about the notes during its closing arguments and ruled that the notes did not affect the outcome of trial.

Rule 26.2, Tennessee Rules of Criminal Procedure, is Tennessee's version of the "Jencks Act," which was created as a result of the United States Supreme Court's decision in Jencks v. United States, 353 U.S. 657 (1957). The Rule provides:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). A "statement" is defined as "[a] written statement that the witness makes and signs, or otherwise adopts or approves" or "[a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f)(1), (2). "The determination of what constitutes a producible statement is a matter that rests purely within the discretion of the trial judge and can be set aside by the appellate courts only if his decision is clearly erroneous." State v. Daniel, 663 S.W.2d 809, 812 (Tenn. Crim. App. 1983).

The State argues that the trial court did not err because counsel's notes "are not summaries but constitute very detailed notes which track, point by point, Ms. Taper's testimony." However, we have reviewed the notes and conclude that they do not meet the definition of a "statement." First, the notes were not signed, approved, or adopted by Ms. Taper. Moreover, they clearly were not a "substantially verbatim" recital of Ms. Taper's interview. In fact, the notes alone tell the reader almost nothing about her interview. For example, the notes mention a "JEEP CHEROKEE" but do not say that the Appellant was in the Jeep or that Wiz was driving it and offer no explanation as to what

role the vehicle played in the Appellant's alibi. The notes say "JUMPED IN CAR" and "TALKED 5-8 MIN" but do not say who jumped in the car or who talked. In fact, without Ms. Taper's direct testimony, the notes are so cryptic that they do not make sense. Therefore, we have no hesitation in concluding that the trial court erred by requiring that the Appellant disclose the notes to the State.

Next, we must determine the effect of the error, specifically whether it "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). The State's establishing a motive for the Appellant to retaliate against the victim, Charlotte Brown's hearing the shooter confront the victim just prior to the shooting, and Brian Ayers's eyewitness identification of the Appellant as the shooter was strong evidence of his guilt. Moreover, the Appellant never told Sergeant Berryman that he took Ms. Taper to McDonalds. Instead, he claimed that he was "walking around with his girlfriend that day." While the trial court's error negatively impacted Ms. Taper's credibility, her lying about the number of times she visited the Appellant in jail and her failure to tell the police or the State's investigator that she was with the Appellant at the time of the shooting also hurt her credibility. Accordingly, we cannot say that the trial court's error more probably than not affected the judgment and agree with the trial court that the error was harmless.

## C. Rule 404(b)

Finally, the Appellant claims that the trial court erred by prohibiting defense counsel from questioning Lenwood Jones about the victim's being known as a burglar. He contends that because the State's theory was that he killed the victim in retaliation for burglarizing his home, he should have been allowed to present evidence that other people may have wanted to retaliate against the victim for breaking into their homes. The State argues that the trial court properly prohibited defense counsel's questioning the witness. We agree with the State.

Prior to Mr. Jones's testimony, defense counsel requested a jury-out hearing pursuant to Tennessee Rule of Evidence 404(b). During the hearing, Mr. Jones testified that he used to be a member of the Bloods gang. The victim also was a member. However, the gang "stripped [the victim of] his status" in November or December 2013, and the victim was not a member at the time of the shooting. Mr. Jones explained that one of the reasons the victim was removed from the gang was that he was breaking into homes. Mr. Jones said that the victim was "doing too much" and was "too hot," that he saw the victim with stolen property, and that the victim tried to sell him some of the property.

On cross-examination, Mr. Jones testified that he saw the victim with "[a] flat screen, selfie stick and a laptop" and that the victim "came to the hood and [was] telling everybody he was trying to [sell] them. Like everybody know that what he do." Mr. Jones acknowledged that he was not with the victim when the victim stole the property and that he was told the victim was committing burglaries. The State asked, "By whom?" Mr. Jones answered, "By like it's the person over us, Big Homey."

The trial court said it did not find by clear and convincing evidence that the victim was a burglar. The trial court also ruled that the probative value of the evidence was outweighed by the danger of unfair prejudice because the defense failed to present any proof that a specific person other than the Appellant wanted to kill the victim in retaliation for a burglary. The Appellant claims that the trial court erred because "Mr. Jones' testimony establishes that [the victim] had a reputation for being a thief" and because "the State had already presented evidence that [the victim] was a thief."

Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible. See Tenn. R. Evid. 404(b). The Rule also provides that evidence of other bad acts may be admissible for other purposes, such as "'to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.'" State v. Moore, 6 S.W.3d 235, 239 n.5 (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)). Previously, our supreme court had determined that Rule 404(b) applied only to the accused. See State v. Stevens, 78 S.W.3d 817, 837 (Tenn. 2002). However, it now applies to "any individual, including a deceased victim." Tenn. Code Ann. § 24-7-125 (Supp. 2014).

Before a trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

- 22 -

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court did not find the proof of the victim's committing other burglaries to be clear and convincing. That alone justified that court's excluding the evidence under Rule 404(b). We note that although Katirria Coburn testified for the State that the victim claimed to have broken into the Appellant's apartment and taken the Appellant's property, Ms. Coburn never testified that the victim was known to be a thief or a burglar. The court complied with the procedures of Rule 404(b), and we find no abuse of discretion in the court's ruling that the evidence was inadmissible.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE